THE CONSUMER LAW GROUP
Alan M. Mansfield (SBN 125998)
alan@clgca.com
10200 Willow Creek Road, Suite 160
San Diego, CA  92131
Tel: (619) 308-5034
Fax (888) 341-5048

MAURIELLO LAW FIRM, APC
Thomas D. Mauriello (SBN: 144811)
tomm@maurlaw.com
1181 Puerta Del Sol, Suite 120
San Clemente, CA  92673
Tel: (949) 542-3555
Fax: (949) 606-9690

PENN & SEABORN
Myron C. Penn (Admitted *Pro Hac Vice*)
myron@pennandseaborn.com
L. Shane Seaborn (Admitted *Pro Hac Vice*)
shane@pennandseaborn.com
53 Highway 110
P. O. Box 5335
Union Spring, AL  36089
Tel: (334) 738-4486
Fax: (334) 738-4432

Attorneys for Plaintiffs
[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| FREDDIE LEE SMITH and LUE VAIL SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PATHWAY FINANCIAL MANAGEMENT, INC.,<br><br>Defendant. | CASE NO.: SACV 11-1573-JVS (MLGx)<br><br>**CLASS ACTION**<br><br>**DECLARATION OF ALAN M. MANSFIELD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing Date:** **October 15, 2012**<br>**Time:** **1:30 p.m.**<br>**Courtroom:** **10C**<br>**Judge:** **Hon. James V. Selna**<br>**Trial Date:** **March 1, 2013**<br><br>**Complaint Filed: October 10, 2011** |

-1-

I, Alan M. Mansfield, declare as follows:

1.    I am an attorney duly licensed to practice before all courts in the State of California and this Court.   I am one of the attorneys representing Plaintiffs Freddie Lee Smith and Lue Vail Smith ("Plaintiffs") in this action.   I make this declaration based upon my personal knowledge.

**Evidence Supporting Class Certification**

2.    Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the Deposition of Chau Phan, a.k.a. Peter Poon, taken on May 31, 2012. Initially Mr. Poon testified he lived in Nevada, but did not know his residence address.  (Dep. at 5-6.)   Two hours later, after several breaks, he volunteered his address.  (Dep. at 67.)   Pathway was formed by Mr. Poon in 2008.  (Dep. at 15.) He has been the president of Pathway since 2010, and the CRO of Pathway since 2008.  (Dep. at 9-10.)   He was also the CFO of Beacon Debt Solutions since 2007 (Dep. at 10), was part owner of Beacon and sold Beacon in April 2010.  (Dep. at 15.)   Beacon was also in the debt settlement business and operated similarly to Pathway.  (Dep. at 38-39.)  Mr. Poon also owned another debt settlement company called New Start Debt Management, which was formed in 2007 and closed in 2008. (Dep. at 55.)  Mr. Poon also owned another debt settlement company called First Source Financial Management, which was formed in October 2007 and is still operating; it is located at the same address as Pathway.  (Dep. at 67.)   The shareholders of Pathway were Poon and Ryan Taj.  (Dep. at 16.)  Mr. Taj was CEO of Pathway but left in 2010 because the company was doing poorly financially, making Mr. Poon the sole owner.  (Dep. at 18.)  He did not know of California's prorater's license requirement: "Q: Does California require a license for Pathway to conduct debt-settlement services? A: No."  (Dep. at 25.)   Pathway projects a 40% discount on the settlement of all its clients' debts.  (Dep. at 31; 42.)  It is the same percentage discount estimated for all Pathway customers.  The 40% figure came from Mr. Poon's "past experience."  (*Id*; 39-40.)  He did unspecified research as to

-2-

MANSFIELD DECL. ISO PLTFS' MOTION FOR        CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

the industry standard.  (Dep. at 40.)  Mr. Lenard was Pathway's "legal counsel" in November 2008, but he was not an employee of Pathway and was not an attorney for Pathway.  (Dep. at 33.)  He contracted with Pathway to "review client file for the suitability." (Dep. at 34.)  He worked for Pathway from August 2008 to May 2010, although Mr. Lenard testified he only worked with Pathway until 2009.  Mr. Poon could not answer whether Pathway was a "client" of Lenard.  Pathway paid Lenard an hourly fee for file review, supposedly out of Pathway funds and not client funds.  (Dep. at 34-35.)   The 12% up front enrollment fee was applied to all customers.  (Dep. at 42-43.)  In May 2010 – for new customers but not for existing customers (Dep. at 44) -- they decreased the enrollment fee from 12% to 5% but raised the settlement fee from 8% to 20%.  (Dep. at 43-44.)  The FTC changed the law prohibiting enrollment fees in October 2010, so Pathway closed its sales department in February 2011 because it was much harder to operate profitably.  (Dep. at 51-52.)   As of the date of Mr. Poon's deposition, Pathway had 15 employees, whereas it previously had 150.  (Dep. at 52.)  Also as of the date of Poon's deposition, Pathway was about to become two months behind on rent.  (Dep. at 52.)  Pathway has no other locations of operation except Garden Grove California and none out of state.  (Dep. at 53.)   As of his deposition, Pathway had 2,100 clients (peaking in June 2010) and amount that was going down by 300 per month.  (Dep. 57, 61.)  Pathway did direct mail advertising from August 2008 to March 2009.  He and Ryan Taj were in charge of that advertising, and they sent more than 10,000 pieces nationwide.  Terminated this advertising because was not cost effective.  (Dep. at 77-78.)  Pathway did no other direct advertising other than the direct mail, but from March 2009 through October 2010 it has bought leads from companies that ran generic radio ads that did not identify Pathway.  (Dep. at 78-81.)  Pathway also bought leads from a company called Vintage Media that ran generic television ads that did not identify Pathway.  (Dep. at 82-83.)   Caroline Elrod has never been an in house attorney at Pathway despite what the letter to

-3-

clients say.  (Dep. at 86.)  He admits letters were sent out by Pathway employees under Lenard law firm letterhead.  (Dep at 90-93.)   Mr. Poon denies there were state actions against Pathway by Maine, but admits to such actions by Connecticut and Minnesota.  (Dep. at 93-95.) Mr. Poon claims the can measure success rate in reducing client debts monthly because they did monthly performance reports every month generated by the negotiations department.  (Dep. at 97-98.)  However, no such analysis was ever performed.  (Dep. at 98.)   He also testified Pathway reviewed the radio advertisements to make sure they were accurate and not over exaggerating.  (Dep. at 100.)

3.     Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the Deposition of Stephen Crosby, taken on May 31, 2012.  Mr. Crosby was first a sales associate and then sales manager at Pathway, and was there from 2008 to late 2009 (Dep. at 7).  All sales calls were recorded (Dep. at 9, 15); however, none of these calls have been produced in discovery.  In terms of using scripts: at least over 50 percent of the sales agents' conversations with clients came directly off a script, because "we wanted to make sure every agent was uniformly giving the same exact answers" (Dep. at 12).  In terms of the average 40% debt reduction figure: "[T]he thing about doing debt negotiating, every creditor is different.  Every client's situation is different, so the approximate debt repayment amount we let them know this is a figure that could possibly happen. . . .  It could possibly happen to be more than what's being put here.  Even though it says a 36-month term, it doesn't necessarily mean it's only going to take 36 months.  It could take longer." (Dep. at 21-22).   In terms of calculating the debt discount, he testified, "Everything is pretty much done in the system.  We put in all of the debts, and the system itself puts out the number." (Dep. at 22-23).

4.     Attached hereto as **Exhibit 3** is a true and correct copy excerpts from the Deposition of Sujatha Dsouza, taken on May 31, 2012.  Sujatha Dsouza is Pathway's Client Relations Manager since October 2010 (Dep. at 7).  Exhibit 7

-4-

1  (attached to this excerpt of her deposition for reference purposes) contains a report
2  the number of clients assigned to each client relations representative, and if you add
3  totals, it shows the total number of clients of Pathway, which are far less now due
4  to downsizing (Dep. at 22-25; and Exhibit 7); if you add the client totals contained
5  on Exhibit 7, there were 3,257 clients at time of preparation of that report and many
6  of the customer service representatives were responsible for over 500 clients.
7  Pathway had 29 Customer Service Reps in 2009 and 51 in 2010 and only 18 in
8  2011 (Dep. at 26).  It also employed 67 Sales and Credit consultants in 2009 and 92
9  in 2010, but none in 2011 (Dep. at 26-28).  Pathway was required to record the
10  compliance calls with client, including any settlement authorizations, changes in
11  terms or payments, are recorded, uploaded on system, and kept "indefinitely"
12  including after client graduates (Dep. at 30-31).  However, only one telephone call,
13  recorded 3 days after the Smiths were signed up for services by Pathway, have been
14  produced in discovery.  Pathway's "Debt Manager" system contains entries for all
15  communications with a particular client and reflects all activities in the client's
16  account, including all departments at Pathway (Dep. at 38).

17       5.       Attached hereto as **Exhibit 4** is a true and correct copy of the
18  excerpts from the Deposition of Ernie M. Schuerman, Jr., taken on July 3, 2012.
19  Mr. Schuerman was employed by Pathway as a sales agent between September and
20  November 2008, and was the sales representative for the Smiths.  (Dep. at 10.)
21  After receiving two days of training, in responding to calls from customers he
22  would follow a script and enter data into a Pathway database.  He was paid on
23  commission based on signing up customers, and if representatives did not sign up a
24  certain minimum number of customers each month (he estimated 25) they were put
25  on probation and then fired.  (Dep. at 14-16, 23, 43-47.)   The calculation of debt
26  saving provided to the Smiths was automatically generated by Pathway's software
27  based on Pathway's average settlements.  (Dep. at 26, 29-30.)  One of the key
28  selling points to customers during the sales process was that Pathway was

MANSFIELD DECL. ISO PLTFS' MOTION FOR       CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

represented by counsel, and that such counsel was Mr. Lenard, as well as that they would stop creditor harassment, lower their overall monthly payments and relieve clients of their unsecured debts for less than what they owed. (Dep. at 30, 54.) The Smiths were entered into the Pathway system and signed all documentation on November 17, 2008 -- three days before any supposed client confirmation call. (Dep. at 33.) He was also instructed to tell all customers they would need to stop paying their creditors as they would not settle with a client who was on time with their payments and Pathway would not pay any consumer debts until it was first paid. (Depo at 52-56.)

6.     Attached hereto as **Exhibit 5** is a true and correct copy of the excerpts from the Deposition of Ryan A. Aguilar, taken on July 3, 2012. Mr. Aguilar was initially a sales manager and then the COO of Pathway. He also worked with Beacon Debt Solutions, and considered them like the same venture (Dep. at 9-10). He testified Pathway engaged in direct mail advertising and Mr. Poon was responsible for that, and he was responsible for ordering radio and television marketing from vendors, from whom Pathway would buy sales leads. He would be sent and hear samples of the radio advertisements before they purchased them as "we would want to hear what was said" (Dep. at 20-22). So far none of these samples have been produced. Sales representatives were paid on commission based on the total amount of debt enrolled into the Pathway system (Dep. at 28-29). At some point (approximately May 2010, according to Mr. Poon) Pathway decided to change its payment structure "so that we can get more activity on settling those accounts quicker" (Dep. at 31-32). It was his understanding as the COO of Pathway that Pathway was required to be licensed in certain states to do business as a debt settlement company, but did not know whether Pathway was required to be licensed in California (Dep. at 49-50). Pathway's advertising website was developed in-house (Dep. at 64).

/ / /

MANSFIELD DECL. ISO PLTFS' MOTION FOR        CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the excerpts from the Deposition of Richard A. Lenard, taken on July 3, 2012.  Mr. Lenard was retained by Pathway pursuant to an oral agreement to prepare contracts, including the form client services agreement, and give them guidance in terms of negotiating with creditors (Dep. at 11-13, 16-17).  He did not consider including a provision asking clients to waive any conflicts representing both consumers and Pathway, saying it was "an oversight on my part" (Dep. at 17).  He provided services to Pathway for about a year between the summer of 2008 and the summer of 2009 (Dep. at 18).  Mr. Lenard's duties were to review customer files and determine if they were a candidate for bankruptcy or possible violations of the Fair Debt Collection Practices Act, although he had no substantive experience as a debt collection attorney.  He would spend 10-15 minutes reviewing a client's file and was paid on average $40 per file.  That was the full nature of the services he would do with regard to any particular individual client file (Dep. at 20-27, 32-33, 65).  He would only become involved if a creditor was particularly difficult, but it was rare that he did so.  While the attorney services agreement (*see* Ex. 13) indicated that settlement negotiation was part of the services he was providing, such negotiation was undertaken primarily by Pathway.  The only work that would be done to contact unsecured creditors was that his law firm would send out a form cease and desist letter, but it was Pathway that did so using his name and directing companies to contact Pathway. These letters would be sent out before he had actually undertaken any file review  (Dep. at 50-53, 55-57, 63-64).  He claims to have made it very clear to Pathway that his name and the company's name should remain separate as doing so would give the indication they were partners when they were not (Dep. at 34, 41).  While the letters sent out by Pathway indicate they were sent out by Jennifer Simmer as a Law Clerk for Mr. Lenard, she was not his employee, and the documents sent out to clients were prepared by Pathway, not by Mr. Lenard (Dep. at 35-36, 39-41).  He provided the same types of services to both Pathway

-7-

and Beacon Debt Solutions, which he described as providing "very similar" services (Dep. at 46-47).  He did not tell Pathway he was being or had previously been disciplined by the State Bar of California because "it never came up" and "I didn't see it as relevant" (Dep. at 47, 67).  Mr. Lenard stopped performing work for Pathway in 2009 because "for what I was charging I didn't see there was really any benefit to the clients."   Supposedly substitution letters were to be sent out to all Pathway clients, but he does not know if they were ever sent (Dep. at 57-61).  In fact no such letters were sent to the Smiths, except as discussed infra after the Smiths advised Pathway they had retained their own counsel.

8.     Attached hereto as **Exhibit 7** are true and correct copies of Plaintiffs' responses to Pathway's First Set of Interrogatories, Document Requests and Requests for Admissions.

9.     Attached hereto as **Exhibit 8** is a true and correct copy of a chart prepared by Pathway summarizing the payment made by Plaintiffs to Pathway and the fees charged to them by Pathway.  This document shows that the Smiths paid $11,285.92 to Pathway, and Pathway retained $3,198.08 in up-front fees, $672.56 in contingent settlement fees, and $796.94 in maintenance fees, for a total of $4,667.58.  This document also shows that Pathway paid $3,983.00 to HSBC but paid *no* money to Bullock County Hospital or Discover Bank, the two other creditors for which Plaintiffs enrolled with Pathway.  After Plaintiffs' counsel's repeated requests, several months ago the remainder of Plaintiffs' monies collected by Pathway were refunded to the Smiths.  Thus, it appears Pathway charged the Smiths and kept in fees approximately 41% of the total amount paid by the Smiths to Pathway.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of a chart prepared by Pathway listing the Class members' residences by state.  According to this chart, during the Class Period Pathway had a total of 4,483 customers, 3,317 of whom are current clients for which Pathway is still holding money (although

-8-

Mr. Poon in his deposition claimed that the current number was closer to 2,100). Discovery is outstanding asking Pathway to identify the total dollar amount of funds Pathway still controls on Class members' behalf.    According to the deposition testimony of Mr. Poon, Pathway's President and owner, Pathway maintains records of all Class members, their addresses, the amounts paid by them and communications with them in a database called Debt Manager.   From this database Pathway should be able to generate a list of all Class members and their current or last known addresses.   If Class notice needs to be sent to them, these addresses can be run through the National Change of Address database to update these addresses using an independent third party sources.   A short one page Court approved notice can then be mailed to each of them advising them of the pendency of this action and directing them to a website where they can obtain more information about the action and request exclusion if they desire to do so.   I can provide an exemplar of such a notice if there is any dispute about this issue.

11.    Attached hereto as **Exhibit 10** is a true and correct copy of a cease and desist order issued by the State of Maine against Pathway dated July 7, 2009 (downloaded from http://www.maine.gov. on August 5, 2012) prohibiting it from doing business in that state as a debt management service provider without the required license, and requiring it to refund all fees collected from Maine consumers.

12.    Attached hereto as **Exhibit 11** is a true and correct copy of a cease and desist order issued by the State of Connecticut against Pathway dated August 19, 2011 prohibiting it from doing business in that state without the required license and requiring Pathway to refund all fees collected from Connecticut consumers.

13.    Attached hereto as **Exhibit 12** is a true and correct copy of a Consent Judgment entered in the State of Minnesota against Pathway dated May 11, 2010 prohibiting it from doing business in that State without the required license and requiring Pathway to refund over $159,000 in fees it charged as well as all monies held in trust to Minnesota residents.   Since according to Exhibit 9 there were 54

MANSFIELD DECL. ISO PLTFS' MOTION FOR        CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

Minnesota residents, that comes out to an average fee per consumer of $3,000. There may be additional similar types of orders and judgments, but Pathway has so far not produced them in discovery.

14.    Attached hereto as **Exhibit 13** are true and correct copies of Plaintiffs' customer information forms and agreements provided to them by Pathway, as well as the attorney/client agreement they received from Pathway in November 2008. Mr. Poon and Mr. Crosby both testified that the amount the Smiths were designated to pay to settle their debts (reflected at Page 1 of Exhibit 13) is computer generated based on 55% of the outstanding debt balance.  As stated above, Mr. Poon also testified that this was not an industry standard number, but rather a number he created on his own.

15.    On page 7 of Exhibit 13 is the choice of law and venue provisions in the form agreements used by Pathway selecting California law and this Court as the law and venue that applies to all Class members.  Pathway has indicated in discovery that with the exception of changing the amounts, this is the form agreement provided to all Class members.

16.    Attached hereto as **Exhibit 14** is a true and correct copy of an Order from the California Corporations Commission Order dated July 7, 2011 prohibiting Beacon Debt Solutions, Inc. from engaging in business as a prorater in California without the required business licenses to act as a prorater.  I have confirmed with the California Department of Corporations that this Order has in fact been signed. As noted above, Mr. Lenard testified that he advised and worked for both Beacon and Pathway, and  that they are engaged in the same business and provide the same services to consumers.

17.    On December 23, 2011, I contacted the California Department of Corporations and confirmed that there is no record that Pathway is licensed as a prorater.    I further confirmed this on August 3, 2012, by visiting *http://www.corp.ca.gov/FSD/licensees/default.asp*, where persons can search the

MANSFIELD DECL. ISO PLTFS' MOTION FOR        CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

name of a company to determine if it is a licensed prorater.  In addition, in its discovery responses Pathway has admitted it is not licensed to operate as a prorater in California or is not aware of the application of such requirements to Pathway. *See* Plaintiffs' First Set of Requests for Admission and Pathway's Response No. 2 dated February 24, 2012 (see **Exhibit 15**); Poon Dep. at Page 25.

18.   Attached hereto as **Exhibit 16** is a true and correct copy of the customer notes for the Smiths created by Pathway, which were authenticated by Ms. Dsouza at her deposition.  According to those notes created by Pathway, the first contact Pathway made with HSBC to attempt to negotiate their consumer debt was in June 2010; and only one call was made to Bullock County Hospital in April 2010 (until August 2011, 6 months after receiving a letter from the Smiths' counsel demanding the account be cancelled).  This was a year and a half after the Smiths had retained Pathway to deal with all of their consumer debts.  They did not event attempt to contact Discover Bank until after the Smiths advised Pathway that they had been sued by Discover Bank in collections.  Those notes also indicate that a*fter* receiving a pre-suit demand from Plaintiffs' counsel, Defendant wrote directly to Plaintiffs to request that they authorize a different attorney, Caroline Elrod of Garden Grove, California, to represent them in place of Mr. Lenard.  Since she is also not licensed to practice law outside California, she could not represent any Class members outside California

19.   Attached hereto as **Exhibit 17** is a true and correct copy of Pathway's website, *www.pathwayfm.com*, which I downloaded in its entirety on February 6, 2012.  Within a month after I did so, that website was no longer available for public access.  Page 17 of this Exhibit discusses the benefits of doing business with Pathway and states: "What would you rather have, a 650 credit score with credit that will take you decades to pay off or an 800 credit score once you have eliminated your credit card debt and taken a fresh start towards your financial freedom?"

MANSFIELD DECL. ISO PLTFS' MOTION FOR        CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

20.    Attached hereto as **Exhibit 18** is a true and correct copy of an inquiry into Pathway's business practices received by Pathway from the Colorado State Attorney General's office dated October 20, 2010, and a form created by Pathway entitled "Attorney General Complaint Detail" to deal with the complaints it was receiving nationwide.   According to copies of consumer complaints recently produced by Pathway (and there is no guarantee this is a complete list), Pathway received has inquiries from the consumer protection divisions of at least eight states, including California.

21.    Attached hereto as **Exhibit 19** is a true and correct copy of the Better Business Bureau report for Pathway, that I downloaded from *http://www.bbb.org* on August 5, 2012.   According to this report the BBB has given Pathway an "F" rating based on the close to 100 complaints it has receiving about Pathway's business operations, and that it had not obtained the licenses required by law.

22.    Attached as **Exhibit 20** are true and correct copies of several letters sent by Pathway to the Smiths' creditors, where its employees stated they were sending such communications as either a law clerk or settlement negotiator for Richard A. Lenard, Esq.  Mr. Lenard testified that he never employed such persons and did not authorize them to send such letters.  The letter to the Bullock County hospital, supposedly sent on the Smiths' behalf, did not even include an address. Also attached as part of Exhibit 20 is a letter from Caroline Elrod, in which represented she was in-house counsel for Pathway.   According to Mr. Poon's deposition testimony, she was never in-house counsel for Pathway.

23.    Attached as **Exhibit 21** is a true and correct copy of the order filed June 6, 2012 from the State Bar of California disbarring Mr. Lenard from the practice of law for practicing law in other states without a license on behalf of numerous clients, including both Pathway and Beacon.  Also submitted as **Exhibit 22** is a true and correct copy of a printout from the State Bar of California's website that Mr. Lenard authenticated during his deposition, indicating Mr. Lenard had

-12-

been previously suspended on three occasions by the State Bar.  None of this information apparently was ever disclosed to the Smiths or the Class members even though Pathway's form agreements required Class members to retain Mr. Lenard as their legal counsel as part of Pathway's debt management program, nor did the agreement disclose or ask for a waiver of any conflicts in Mr. Lenard representing both Pathway and Class members -- an omission Mr. Lenard testified was an "oversight", as summarized above.

24.    Attached as **Exhibit 23** is a true and correct copy of Plaintiffs' First Set of Interrogatories and Pathway's responses thereto. In its response to Interrogatory No. 3, Pathway indicates that as of mid 2011 the average customer service representative has 500 clients.  If, as Mr. Poon testified, currently Pathway has only 15 employees, only 6 of whom are customer service representatives, and if Pathway still has over 3,000 active clients, this means it still only has one representative for approximately 500 customers.  This conclusion is supported by Ms. Dsouza's deposition testimony summarized above.

25.    Attached as **Exhibit 24** is Pathway's job descriptions for its service agents and customer service representatives.  According to this document, at least four hours each day of all employee time must be spent talking to clients.

**Qualifications of Class Counsel**

26.    Attached hereto as **Exhibit 25** is a true and correct copy of my curriculum vitae.  Both my co-counsel and I have substantial experience litigating class action and consumer protection cases before both trial and appellate courts throughout California and the United States.  Collectively we have already devoted hundreds of hours of attorney time and spent thousands of dollars in resources towards the litigation of the claims asserted against Pathway in this action.  This work has included everything from pre-lawsuit investigation, drafting and amending the complaint, preparing this motions and draft motions to compel (which if full and complete responses to discovery are not received will shortly be

-13-

filed), taking six depositions, making court appearances, and both preparing and reviewing documents and discovery responses.  I, along with my co-counsel, have committed and will continue to commit substantial resources to adequately represent the class in this action, as required by Fed. R. Civ. Proc. Rule 23(g).

**Trial Plan**

27.    If this matter goes to trial, I believe based on both my and my co-counsel's experience of having taken several class actions through trial that Plaintiffs can implement a class trial plan that will rely almost exclusively on the documents and testimony that have been and will be provided by Pathway.  First, Plaintiffs will demonstrate how Pathway uniformly operates using form agreements such as Exhibit 13.  Mr. Poon also testified that the fees that are automatically deducted are uniformly set by Pathway and, with one exception where the fees schedule was modified in May 2010 for new customers, would not vary between Class members.    Plaintiffs would also provide exemplars of the "blind" advertisements Pathway used to solicit customers and the direct mailing piece it used, once this information has been produced in discovery.  Mr. Poon admitted at page 100 of his deposition that Pathway reviewed these radio advertisements for accuracy, but so far Pathway has refused to produce exemplar of this information. Such a request for these advertisements is still outstanding, as are several other requests as set forth in Mr. Mauriello's Declaration.  Plaintiffs would also provide examples of the form agreements used by Pathway, such as one attached as Exhibit 13 to this Declaration.

28.    Second, we will present testimony as to how Pathway operates using the witnesses set forth above, as well as several additional witnesses who we have identified but yet to depose, as well as an employee operations manual that Mr. Aguilar admitted in his deposition exists but has not yet been produced. Through such testimony Plaintiffs will be able to explain how the Pathway's agreements, operations, fees and charges in question do not comply with

-14-

California's laws, specifically Cal. Fin. Code § 12200 *et seq*., and 12314-12316, and Sections 1679b(b) and 1679C-E of the Credit Repair Organization Act, and also how Pathway either demanded Class members retain a counsel who has now been disbarred for engaging in such conduct or how Pathway engaged in the unauthorized practice of law in violation of Cal. Bus. & Prof. Code § 6145 and Cal. Fin. Code § 12327.  By such proof, Plaintiffs' claims under the Unfair Competition Law ("UCL") can be established on a Class-wide basis as such claims are at least in part derivative of showing that Pathway violated the above laws, as well as how by using such uniform statements Pathway's conduct was either likely to deceive consumers or was unfair as that term is defined under the UCL.  I anticipate this may largely involve a legal question that can be resolved through either a stipulated set of facts or by summary adjudication, and discovery has already been propounded to address these issues.  If Plaintiffs can show, as I believe is the case, that the agreements and disclosures do not conform to the requirements of both federal and California law, we can use this fact to establish Pathway's class-wide strict liability under the UCL.

29.   Likewise, Plaintiffs' claims under the California Consumers Legal Remedies Act ("CLRA") can be established on a class-wide basis using the same body of evidence referenced in the above materials provided to the Court.  Plaintiffs and the Class have claimed that Pathway has violated, *inter alia*: Cal. Civ. Code § 1770(a)(9), in that Pathway's "acts and practices constitute advertising services with the intent not to sell them as advertised"; Cal. Civ. Code § 1770(a)(14), in representing that a transaction involves obligations which it does not have or "which are prohibited by law" (here, Cal Fin. Code § 12200, *et seq*., the CROA, and Bus. & Prof. Code § 6145); and Cal. Civ. Code § 1770(a)(16), in that Pathway's "acts and practices constitute a representation that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  Plaintiffs will explain at trial how the misrepresentation or failure to

disclose the fact that Pathway was not licensed to do business as a prorater, that it did not in fact have qualified legal counsel to advise consumers or itself engaged in the unauthorized practice of law, was chronically understaffed as set forth above, that the fees and surcharges in question were improperly imposed on the Class members and are prohibited under the above statutes and were *per se* unlawful were consistent for all Class members, and how Pathway's uniform agreements are therefore inaccurate and result in all Class members suffering damage and loss. Pathway's liability under each of these subsections of the CLRA may therefore be established at trial based on essentially the same trial presentation described above.

30.    Based on Plaintiffs' counsels' research and discovery to date, as well as the testimony of Pathway's designated corporate representatives, I believe Plaintiffs can show at trial how Pathway's conduct similarly affected Class members, and that no survey would be necessary to show a likelihood of deception based on the significant number of complaints submitted to Pathway, the BBB and state Attorneys General throughout the United States.  However, if the Court found such a survey necessary, Plaintiffs could provide expert testimony regarding a limited but statistically significant sampling of customer data maintained by Pathway to show that consumer debts were not in fact reduced by the amount Pathway claims on a Class-wide basis and were deceived by Pathway's uniform representations as to what it promised to deliver.

31.    Restitution and damages based on the revenues or profits made by Pathway can also be established on a class-wide basis without resort to individualized proof, as shown by what was ordered by the State of Minnesota as set forth above.  Based on information provided or maintained by Pathway, it appears Pathway maintains documentary and computerized information on the revenues it collected in its Debt Manager database, and would be able to create the same types of charts as set forth in Exhibit 8 or provide such data so that Plaintiffs' counsel or their experts could undertake such an analysis.  In addition, under both

MANSFIELD DECL. ISO PLTFS' MOTION FOR      CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION

state and federal law, if the Court or jury decides Pathway was a prorater or a credit repair organization, by law all fees collected must be returned and all contracts would be determined to be void and unenforceable. Plaintiffs also anticipate providing their own personal testimony about how the materials Pathway distributes resulted in either misleading or no material information being provided to them regarding the facts set forth above, how in fact their consumer debts were ignored for years while Pathway profited and either were not addressed or only after the Smiths had been sued, and the material impact on their credit they actually suffered as a result of these acts and practices and the damages they have suffered as a result of Pathway's illegal conduct and how if they had known all the true facts they never would have done business with Pathway.

32.    The above is a general overview of Plaintiffs' trial plan, which will be supplemented and amended as discovery proceeds.  Further discovery will likely yield more evidence that would warrant presentation at trial as part of the trial plan set forth above, since Pathway may produce more relevant information but has not done so to date, or as indicated in the Mauriello Declaration exists, but has not been produced and may need to be the subject of motions to compel.  Thus, while this case is still awaiting production of significant information, the information that is available so far establishes how this case can be manageably tried on a class-wide basis.

33.    Based on numerous telephonic and in person meet and confer discussions both I and Mr. Mauriello have had with Kyle Waldie, counsel for Pathway, in accordance with the local rules for pre-filing discussions prior to filing motions, Mr. Waldie has made it clear that Pathway will oppose all aspects of the motion for class certification and will not agree to any continuances, no matter what the circumstances.  Yet at the same time Mr. Waldie and Mr. Poon have both stated that despite the monies still under its control Pathway has breached its lease, is subject to several lawsuits, has little money and is in the process of wrapping up its

-17-

1  operations -- although it is unclear how it can do so with six customer service
2  representative and between 2,000 to 3,300 active clients.

3      I declare under penalty of perjury under the laws of the United States that the
4  foregoing is true and correct.

5      Executed this 6th day of August, 2012, at San Diego, California.

6

7                              ALAN M. MANSFIELD

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANSFIELD DECL. ISO PLTFS' MOTION FOR    CASE NO. SACV 11-1573-JVS MLGx)
CLASS CERTIFICATION